1  **LAW OFFICE OF STEWART KATZ**
   STEWART KATZ, State Bar #127425
2  555 University Avenue, Suite 270
   Sacramento, California 95825
3  Telephone: (916) 444-5678
4
   Attorney for Plaintiffs
5
6
7                    **UNITED STATES DISTRICT COURT**

8                    **EASTERN DISTRICT OF CALIFORNIA**

9
   LAWRENCE SPIES, SR., and LINDA
10 SPIES, Individually and as Successors in          NO.
   Interest of LAWRENCE SPIES, JR.
11 (deceased);
                                                     COMPLAINT FOR VIOLATIONS OF
12                    Plaintiffs,                     CIVIL RIGHTS AND STATE LAW
                                                     JURY TRIAL DEMANDED
13 vs.

14 EL DORADO COUNTY; CALIFORNIA
15 FORENSIC MEDICAL GROUP, INC.;
   MARSHALL MEDICAL CENTER; JOHN
16 D'AGOSTINI; RANDY PESHON;MATT
   FOXWORTHY; JACKIE NOREN: ROBIN
17 HOPE; RAYMOND HERR,M.D.; LISA
   ISSACSON; TAYLOR FITHIAN,M.D.;
18 MARK HANGEBRAUCK; JOHN J.
   SKRATT, M.D.; ALEXIS F. LIESER, M.D.;
19 DOES 1-50
                    Defendants.
20
21 _____/

22

23
          Plaintiffs complain and allege as follows:
24
                    **INTRODUCTION**
25
          1.       This action arises from the preventable suicide death of the deeply depressed
26
   thirty-four (34) year old Lawrence Michael "Jake" Spies Jr., on September 19th, 2015 at the
27
   El Dorado County Sheriff Department's Placerville Jail.  Spies had been arrested the night
28

   Spies-Complaint for Damages                                                              1

before on misdemeanor charges.  Spies had been at the jail less than twenty-four (24) hours when he died.

2.      Despite both sheriff's and medical staff being having actual knowledge that Jake Spies was in immediate danger of committing suicide,  he had not been placed on any suicide precautions.  Spies was not assessed for his risk of suicide nor were any protective measures recommended by the medical staff.

3.      Spies had a long list of serious factors that indicated that he was a high risk of suicide. These included a history severe depression, two (2) significant suicide attempts within the prior twelve (12) months, a prior suicide attempt at the Placerville Jail and a history of psychiatric hospitalizations. At the time of his arrest he was severely depressed and suicidal. All of this information was shared with the arresting officers by Spies' parents who had driven to the arrest location prior to their son being taken to the hospital or jail.One of the officers acknowledged remembering details of one the attempts within that past year.

4.      The medical and mental health services at the Placerville jail are outsourced to California Forensic Medical Group, Inc. (CMFG) a privately held, for-profit corporation. In 2013 was purchased for between sixty and eighty million dollars by an international venture capital group, H.I.G., LLC.  H.I.G.'s website for CFMG now boasts the motto, Always do the right thing.". Unfortunately, always doing the right thing for their shareholders comes at the expense of the patients entrusted to their care.

5.      The profitability for CFMG and the weakness of the care provided in this case is evident from the staffing levels, which are the core of the contract between CFMG and El Dorado County. Almost all of the staffing is by part-time licensed vocational nurses, LVNs, whose scope of practice does not permit them to perform suicide risk assessments. The greatest savings for CFMG and the greatest single weakness of medical care at the Placerville jail is the absence of any medical professionals, other than an LVN, between Friday afternoon and Monday morning. This is the same time that brings in the greatest numbers of arrestees. For someone who, like Jake Spies, is taken into custody on a Friday

Spies-Complaint for Damages                                                      2

1  night, there will not be any scheduled medical or mental professional available to perform or

2  recommend a suicide risk assessment until Monday morning.

3        6.     The custody staff placed Jake Spies alone in a general population cell with no

4  suicide safeguards where he was found dead as a result of a ligature fashioned around his

5  neck form torn bedding affixed to the step of a ladder in the cell,  the next evening when

6  food was being brought to his cell. There were apparently no cell checks performed after

7  Spies was placed in his the night before. The El Dorado County Sheriff's Department was

8  unable to say when he  Jake Spies was last seen alive or what time he committed suicide.

9        7.     The suicide of Spies had a devastating effect on his parents and his siblings.

10

11                              **JURISDICTION AND VENUE**

12        8.     This complaint seeks damages and attorneys' fees pursuant to Title 42 U.S.C.

13  sections 1983 and 1988 for violations of decedent's and survivors' civil rights and violations

14  of California State law.  Jurisdiction is founded upon Title 28 U.S.C. sections 1331 and

15  1343.  This Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to

16  28 U.S.C. § 1367.

17        9.     Plaintiffs' claims arose in the County of El Dorado, California. Venue lies in

18  the Eastern District of California pursuant to 28 U.S.C. § 1291(b)(2).

19                              **PARTIES**

20        10.    Plaintiff Lawrence Spies, Sr. is the father of the decedent, Lawrence Spies, Jr.

21  (also referred to as Jake Spies) and a resident of Lotus, California.  Plaintiff is decedent's

22  next of kin. Lawrence Spies is suing individually and as co-successor in interest to Jake

23  Spies pursuant to California Code of Civil Procedure §§377.10 et seq.

24        11.    Plaintiff Linda Spies is the mother of the decedent, Jake Spies, and a resident

25  of Lotus, California.  Plaintiff is decedent's next of kin. Linda Spies is suing individually

26  and as co-successor in interest to Jake Spies pursuant to California Code of Civil Procedure

27  §§377.10 et seq.

28

Spies-Complaint for Damages                   3

12.     Plaintiffs Lawrence and Linda Spies are bringing this action pursuant to California Code of Civil Procedure §§377.20 et seq. and 377.60 which provide for survival and wrongful death actions.  Plaintiffs also are bringing claims on behalf of their deceased son under 42 U.S.C. §§1983 and 1988, for violations of the United States Constitution and federal civil rights law.

13.     The declaration required under California Code of Civil Procedure § 377.32 for persons bringing an action as a decedent's successor in interest  is Attachment 1 to this Complaint.

14.     Defendant El Dorado County is a political subdivision of the State of California, created and existing by virtue of the laws of the State of California.

15.     Defendant El Dorado County operates and manages the El Dorado County Main Jail, also known as the Placerville Jail, and is and was all times mentioned herein, responsible for the actions or inactions of its employees and agents, and the policies, procedures and customs/practices at the jail which led to and/or caused the violations alleged herein.

16.     Defendant California Forensic Medical Group, Inc., is a California Corporation doing business in the State of California.  In the context of this litigation, CFMG, Inc.is a person. CFMG provides the medical services at the Placerville Jail through a contract with El Dorado County.

17.     Defendant Marshall Medical Center is a California Corporation doing business in Placerville, California. Defendant Marshall employs health care professionals who were negligent in their treatment of the decedent.

18.     Defendant John D'Agostini, is, and was at all relevant times mentioned herein, the Sheriff of the El Dorado County Sheriff's Department and employed by the County of El Dorado.  At all relevant times he was acting within the course and scope of that employment and under color of law.   Defendant D'Agostini is being sued in his individual and official capacities.

Spies-Complaint for Damages                                                                                    4

19.     El Dorado County Undersheriff Randy Peshon directly oversees the correctional division of the El Dorado County Jail.  Defendant Peshon is being sued in his individual and official capacities.

20.     El Dorado County Captain Matt Foxworthy is employed by the El Dorado County Sheriff's Department and is the head of Corrections for the  El Dorado County Sheriff's Department. At all relevant times he was acting within the course and scope of that employment and under color of law.  He is being sued in his individual capacity.

21.     El Dorado County Correctional Lieutenant Jackie Noren is believed to be the Commander of the jail and is employed by the El Dorado County Sheriff's Department. At all relevant times she was acting within the course and scope of that employment and under color of law. She is being sued in her individual capacity.

22.     El Dorado County Deputy Sheriff Mark Hangebrauck is employed as a deputy sheriff by the El Dorado County Sheriff's Department. At all relevant times he was acting within the course and scope of that employment and under color of law.  He is being sued in his individual capacity.

23.     LVN Robin Hope is an employee of CFMG, Inc. at the Placerville jail. At all relevant times she was acting within the course and scope of that employment and under color of law. She is being sued in her individual capacity.

24.     Dr. Raymond Herr is an employee of CFMG, Inc. and the designated medical director for the Placerville jail. At all relevant times he was acting within the course and scope of that employment and under color of law.  He is being sued in his individual capacity.

25.     Lisa Issacson is an employee of CMFG, Inc. and is the program director at the Placerville jail. . At all relevant times she was acting within the course and scope of that

1   employment and under color of law.  Defendant Issacson is being sued in her individual

2   capacity.

3       26.     Dr. Taylor Fithian is an employee of CMFG, Inc. and the designated mental

4   health program director at the Placerville jail pursuant to Title 15. At all relevant times he

5   was acting within the course and scope of that employment and under color of law.  He is

6   being sued in his individual capacity.

7       27.     John J. Skratt, M.D. is a physician who treated the decedent at Marshall

8   Medical Center. Defendant Skratt at all relevant times he was acting  under color of law.

9   Dr. Skratt is being sued in his individual capacity.

10      28.     Alexis F. Lieser, M.D., is a physician who treated the decedent at Marshall

11  Medical Center. Defendant Lieser at all relevant times Dr. Lieser was acting under color of

12  law. Dr. Lieser is being sued in an individual capacity.

13      29.     Does 1 through 5 are El Dorado County Sheriff's Department deputies who

14  participated in the arrest and transportation of Jake Spies from the scene of his arrest to

15  Marshall Hospital and to the Placerville jail. The true names and identities of Does 1

16  through 5 are presently unknown to plaintiffs. Plaintiffs will seek to amend this complaint as

17  soon as the true names and identities of Does 1 through 5 are ascertained.

18      30.     Does 6 through 10 are employees of the El Dorado County Sheriff's

19  Department responsible for the promulgation of polices, both explicit and de-facto. The true

20  names and identities of Does 6 through 10 are presently unknown to plaintiffs. Plaintiffs will

21  seek to amend this complaint as soon as the true names and identities of Does 6 through 10

22  are ascertained. All Doe and all individual defendants were acting under color of state law

23  and in the course and scope of their employment.

24      31.     Does 11 through 20 are employees of the El Dorado County Sheriff's

25  Department responsible for the care and custody of inmates at the Placerville jail, including

26  classification of housing assignments, booking and cell checks. The true names and

27  identities of Does 11 through 20 are presently unknown to plaintiffs. Plaintiffs will seek to

28  amend this complaint as soon as the true names and identities of Does 11 through 20 are

Spies-Complaint for Damages                                                      6

ascertained. All Doe and all individual defendants were acting under color of state law and in the course and scope of their employment.

32.     Does 21 through 25 are supervisors employed by the El Dorado County Sheriff's Department responsible for the supervision of sheriff's department employees at the jail, classification of housing assignments, booking and cell checks. The true names and identities of Does 21 through 25 are presently unknown to plaintiffs. Plaintiffs will seek to amend this complaint as soon as the true names and identities of Does 21 through 25 are ascertained. All Doe and all individual defendants were acting under color of state law and in the course and scope of their employment.

33.     Does 26 through 30 are individuals who cared, treated or assessed Spies at Marshall Hospital September 18, 2015 – September 19, 2015. The true names and identities of Does 26 through 30 are presently unknown to plaintiffs. Plaintiffs will seek to amend this complaint as soon as the true names and identities of Does 26 through 30 are ascertained.

34.     Does 31 through 40 are employed by CFMG, Inc. and established policies, practices, provided supervision in administering health care, were responsible for training, quality assurance, and/or were the program director, medical director and mental health director at the relevant times. The true names and identities of Does 31 through 40 are presently unknown to plaintiffs. Plaintiffs will seek to amend this complaint as soon as the true names and identities of Does 31 through 40 are ascertained. All Doe and all individual defendants were acting under color of state law and in the course and scope of their employment.

35.     Does 41 through 50 are employees of CFMG, Inc. who provided medical and/or mental health treatment at the Placerville jail and who may have participated in the screening process. The true names and identities of Does 41 through 50 are presently unknown to plaintiffs. Plaintiffs will seek to amend this complaint as soon as the true names and identities of Does 41 through 50 are ascertained. All Doe and all individual defendants were acting under color of state law and in the course and scope of their employment.

Spies-Complaint for Damages                                                                                          7

1

**COMPLIANCE WITH GOVERNMENT TORT CLAIM PROCEDURES**

2    36.    As a pre-requisite to the state law claims alleged herein against El Dorado

3  County and its employees/agents, Plaintiffs filed governmental claims with the El Dorado

4  County Board of Supervisors on or about March 16, 2016.

5    37.    By correspondence from the County of El Dorado's agent, dated September

6  8, 2016 these claims were rejected.

7    38.    This action is being filed within six (6) months of the rejection of the claim

8  by El Dorado County, as required by law.

9              **FACTUAL ALLEGATIONS**

10             **Spies Factual Background**

11    39.    At the time of his death, the decedent, Jake Spies, was a thirty-four (34) year-

12  old white male.  He stood six feet, one inch tall and weighed approximately one hundred and

13  sixty (160) pounds.  He was the son of Linda and Lawrence Spies, Sr., and had two older

14  sisters and a younger brother.

15    40.    He had lived in El Dorado County virtually his entire life.  He had a love of

16  the outdoors, animals and his family.  Photographs of Jake Spies with his family are

17  included as Attachment 2. He graduated from Ponderosa High School in Shingle Springs,

18  California, in 1999.  After working various construction-related jobs, he enlisted in the

19  United States Army where his military occupational specialty (MOS) was surveying and

20  engineering.  He was honorably discharged from the Army in 2010 and a childless marriage

21  ended in divorce in 2011.  Following his divorce, he attempted to deal with the subsequent

22  depression by self-medicating with drugs and alcohol, which resulted in a swift downward

23  decline.

24    41.    His severe depression led to a number of serious suicide attempts and

25  involuntary and voluntary hospitalizations for mental illness and substance abuse, and

26  treatment programs through a number of healthcare providers, including the Veterans'

27  Administration.  These suicide attempts include (i) a prior hanging attempt in 2012 at the

28  same El Dorado Country Jail (where he ultimately died), (ii) jumping off a bridge in

Spies-Complaint for Damages                                                    8

Coloma, California, which is in El Dorado County, in September 2014, and (iii) attempting to jump out of a hotel window in Irvine, California in December 2014.

42.     At the time of his death, Jake Spies was living with his parents, Plaintiffs Linda and Lawrence Spies Sr., in Lotus, El Dorado County.

43.     Linda and Lawrence Spies Sr. have been married for forty (40) years and were both supportive and proactive in efforts to have their son's depression and related problems addressed.  Plaintiffs have lived in El Dorado County for 30 years, during which time Linda Spies worked for the same school district.

44.     Lawrence Spies Sr. is a Vietnam veteran who worked in the construction industry. He moved his family from southern California to El Dorado County thirty years ago for the better quality of life he believed it offered his family.

45.     The Spies are a close-knit family and decedent's sisters and brother were also involved in Jake Spies' life, and joined in the effort to help combat Jake Spies' depression and substance abuse issues.

46.     Plaintiffs have been devastated by the loss of their son.  Since their son's death and as a result of their experiences, they have become involved in activities to raise money for suicide prevention so that others will not have to needlessly endure what they have.

47.     Plaintiffs also sought professional assistance in coping with their grief, in addition to bringing this lawsuit through which they hope to improve suicide prevention at the El Dorado County Jail.

**Jake Spies' Arrest on September 18th, 2015**

48.     Jake Spies was arrested late in the evening on Friday, September 18, 2015 on a rural private road approximately two miles from his parents' home.  He was arrested for driving under the influence of alcohol and making verbal threats towards a neighbor, who did not realize that Jake was a neighbor and had called the police.

49.     While driving home from a social gathering with some of her friends, Linda Spies passed where her son's car and a deputy's vehicle had stopped.  She wasn't sure it was

Spies-Complaint for Damages                                                              9

her son's car, but after going home she realized neither her son nor his car were there.  After talking briefly with her husband, they both returned to, what in fact, was the location of her son's arrest.  Once there, they were informed why her son was being  arrested.

50.     At that point, both Mr. and Mrs. Spies were actually relieved their son was going to be in jail, because they were concerned over his potential for immediate self-destructive behavior.  Linda Spies, after getting out of her vehicle, gave a rendition of Jake's mental health, legal history and issues to Defendant Deputy Hangebrauck.  During this conversation, another deputy stood silently by Hangebrauck, but within obvious earshot, while Lawrence Spies remained in the car, also in earshot.

51.     Plaintiff Linda Spies impressed upon the deputies that they were very afraid that Jake was suicidal.  She also told the deputies about her son's multiple former suicide attempts.  Deputy Hangebrauck informed her that he knew about the 2014 Coloma bridge jump incident from which Jake Spies was flown by air ambulance to Sutter Roseville Hospital.

52.     Finally, Linda Spies also recounted Jake's numerous hospitalizations, including multiple 5150 psychiatric holds due to Jake Spies being a danger to himself.  She also told Deputy Hangebrauck how impressed she had been by the Irvine police officers who had responded to Jake's most recent suicide attempt, and how they seemed to have considerable training in appropriately dealing with suicidal individuals.  Deputy Hangebrauck told her that he too had special training in suicide prevention, and would make sure that this information about her son would be properly passed on.  This discussion regarding Jake Spies' precarious mental state lasted between twenty and thirty minutes, at which time the officers apologetically told her they had to go.

53.     Before being taken to the jail, Jake Spies was taken to Marshall Medical Center.  It is unknown at present which deputy or deputies took him to or from Marshall Medical Center and what, if anything, was said during that trip.

**Marshall Medical Center**

Spies-Complaint for Damages                                                                         10

1    54.    Spies was taken to Marshall Medical Center the evening of September 18th,

2    2015. Plaintiffs assert on information and belief that deputies regularly have arrestees

3    medically cleared for incarceration at Marshall Medical Center.

4    55.    At the hospital, Spies was evaluated by Defendant Doctors Skratt and Lieser

5    and Does 26-30 (collectively referred to as "Marshall Hospital Treaters").  Those records

6    note that Jake seemed depressed and intoxicated. There is no indication, based on the

7    records, that any deputy relayed the information regarding Jake Spies' acute suicide risk and

8    history of suicidality, or that Marshall Hospital Treaters had reviewed Spies' records from

9    Marshall Medical Center. The records from Marshall Medical Center included a psychotic

10   episode in 2012 when doctors at the hospital previously cleared him for incarceration after

11   he set all of his clothing on fire and was arrested in the middle of the night on January 23rd,

12   2012, naked and suffering from hypothermia. Further, the Marshall Hospital Treaters failed

13   to preform or request that  a suicide risk assessment of Spies. The failure to have Spies

14   assessed for his risk of suicide at Marshall Medical Center was both a breach of the standard

15   of care for a treating doctor as well as evidencing deliberate indifference to Spies' serious

16   and life-threatening mental health condition.  What the Marshall Hospital Treaters did do

17   was write that Jake Spies was "fit for incarceration", which on information and belief they

18   knew would be placing him in a situation where he would have no immediate access to any

19   mental health professional to either evaluate or treat him.

20   **Operation of the Placerville Jail**

21   56.    The El Dorado County Sheriff's Department operates two jails, the largest of

22   which is the El Dorado County Main Jail in Placerville, also known as and referred to herein

23   as the, Placerville Jail.  As of October 2, 2013, according to the California Board of State

24   and Community Corrections, the Main Jail has a rated capacity of 265 inmates and is a type

25   II facility.  A type II facility means it is used to house both sentenced prisoners and pretrial

26   detainees.

27   57.    The jail is staffed by a combination of correctional officers and deputy

28   sheriffs.

Spies-Complaint for Damages                                                    11

58.     Titles 15 and 24 of the California Administrative Code set forth various requirements and guidelines as to the administration, design and operation of jails in California including the Placerville jail.

59.     "Jail Policy and Procedures Defendants," who are El Dorado County, El Dorado Sheriff John D'Agostini, El Dorado County Undersheriff Randy Peschon, El Dorado County Captain Matt Foxworthy, and El Dorado County Correctional Lieutenant Jackie Noren and DOES 6-20 are responsible for promulgating the jail's policies which are required to be consistent with Title 15, state law and the United States Constitution.

60.     El Dorado County Jail Supervisory Defendants are El Dorado Sheriff John D'Agostini, Undersheriff Randy Peschon, El Dorado County Captain Matt Foxworthy, and El Dorado County Correctional Lieutenant Jackie Noren and DOES 21-25.

61.     The jail is required to place inmates in appropriate, safe cell housing assignments.

62.     El Dorado County Policy/Practices Defendants are required by state law and the Constitution to have a suicide prevention policy in effect. Also required are policies/practices so that arrestees are properly screened regarding both their medical and mental health needs while in custody, both so those needs can be adequately met and so the inmates can be placed in safe and appropriate housing.

63.     El Dorado County Jail Supervisory defendants are required to see that these policies are put into effect and the correctional staff do their jobs appropriately.

64.     The jail includes two safety cells and two sobering cells in addition to general population housing.

65.     A safety cell is a specially designed and designated single occupant cell used to house potentially suicidal inmates. Safety cells are padded, have large viewing windows to facilitate officer observations and do not have points of attachments for ligatures. Inmates placed in a safety cell must be checked on at least every 15 minutes.  It is a requirement that any inmate placed in a safety cell be medically assessed within a maximum of 12 hours of their placement in the safety cell or at the next daily sick call, whichever is earliest.

Spies-Complaint for Damages                                                    12

Additionally, an inmate must be medically cleared to remain housed in the cell every 24 hours thereafter. Further, a mental health opinion on the inmate's placement and retention in the safety cell is required within 24 hours of placement. As discussed below, the El Dorado County Placerville Jail was not staffed in a way that these required assessments or checks could be completed on a weekend.

66.     Sobering cells are protective cells used to house inmates who arrive at the jail under the influence of alcohol and/or drugs until they are no longer under the influence. They have padded floors for the inmates' protection and large viewing windows to facilitate easy observation. Staff is required to check on inmates in sobering cells every half hour.

67.     Inmates who are housed in neither safety nor sobering cells must be checked hourly at least once an hour by the correctional staff. These are alternatively referred to as safety checks. All of the officer checks whether it be in a general population cell, safety cell or sobering cell must be contemporaneously documented.

68.     The jail is required to have sufficient staffing so that they may accomplish all of their mandated duties toward inmates.

## Jail Suicides Generally

69.     Suicide is the leading cause of jail in-custody deaths.

70.     The suicide rate in custodial settings is generally much higher than the suicide rate in the community at large. The suicide rate in jails is significantly higher than in prisons.

71.     Most jail suicides are preventable. It is easier to institute measures to prevent suicide in jail than it is in the community at large. The most important step in suicide prevention is identifying those at the greatest risk of suicide so preventative action can be taken.

72.     Mental health professionals have identified specific documented historic facts, dynamic conditions and environmental circumstances that contribute to a person's risk of committing suicide in custody. Mental health and corrections professionals refer to these as suicide risk factors. Historic facts include prior suicide attempts, psychiatric

Spies-Complaint for Damages                                                          13

hospitalizations, and mental illness.  Dynamic conditions include dysphoric mood, withdrawal from drugs and alcohol, hopelessness.  Environmental circumstances include being incarcerated.  White males are at a significantly higher risk of suicide statistically than other genders and ethnicities.

73.   Every jail suicide at the El Dorado County in the past 20 years has been committed by a white male.

74.   The period of greatest risk for an in-custody inmate to commit suicide is the first 24 hours.   It is recognized that the risks remain significantly higher for the first 72 hours of incarceration.

75.   Cell checks and cellmates notifying deputies of attempts are the most frequent means of thwarting suicide attempts.

76.   All three (3) El Dorado County Jail suicides since the acquisition of California Forensic Medical Group by H.I.G. (discussed below) have occurred within 72 hours of booking and two of those occurred within 24 hours.

77.   Hanging, typically caused by ligatures fashioned to cut off the airways, is the most frequent means by which jail inmates commit suicide. All but one of the suicides at the Placer County Jail in the past twenty years were committed by hanging.

78.   Bedding is the most frequent item out of which ligatures are made.  The next most frequent item is clothing. Many of the proven short-term suicide prevention measures involve removing access to the means and materials to make ligatures.

79.   The El Dorado County Jail Policy/Practices Defendants and the CFMG Management/Entity Defendants, California Forensic Medical Group, Dr. Raymond Herr, Lisa Issacson, Dr. Taylor Fithian and Does 31-40, have the responsibility for developing and implementing a suicide prevention program.  An adequate suicide prevention program identifies, monitors, safeguards and provides treatment to those inmates who present a suicide risk.

80.   When an inmate has been identified as potentially suicidal, it is recognized that those individuals must be immediately safeguarded pending a suicide assessment by a

qualified, licensed, mental health professional.  This safeguarding may take the form of placing the suspected suicidal inmate in a safety cell, or if one is not available, handcuffing the individual and keeping him under constant observation.  Suicide risk assessments are evaluations by trained, licensed, mental health professionals designed to determine the inmates level of suicidality.  Frequently, diagnostic tools such as a suicide risk assessment form are utilized.  The evaluating professional looks at various risk factors.  A history of past suicidal behavior, including suicide attempts, is the most significant risk factor.  The recentness and the lethality (likeliness that the means of the attempt would have resulted in death) correlate to the weight given the suicide history.  Attempts within the year are particularly significant.  Hanging and jumping from a bridge or out of a high window are high lethality methods of attempting suicide.  An in-custody suicide attempt adds additional weight to an in-custody individual's risk of committing suicide.  A history of depression and current depression (dysphoria) are significant risk factors.  Substance abuse is a significant static risk factor while withdrawal from drugs and or alcohol is a significant dynamic risk factor.  A history of psychiatric hospitalizations is a significant risk factor.  A feeling of hopelessness is a significant dynamic suicide risk factor.  An adequate suicide risk evaluation must consider all relatively available relevant information.  It is understood that an express denial of suicidal intent is of limited value when evaluating someone's level of suicidality.

81.     Licensed vocational nurses are not qualified nor are they legally permitted to administer suicide risk assessments.

82.     An adequate suicide prevention policy requires that suicide precautions correlate to an individual's risk of suicide.   Every suicidal or potentially suicidal inmate must be on suicide precautions.

83.     Under an inadequate suicide prevention policy, inmates at a high risk of suicide are placed on suicide watch. This entails placing the suicidal inmate in safety cells. Additionally they are typically placed in safety suits or garments which are tear resistant to prevent the making of ligatures. When an inmate is placed on suicide watch that entails

Spies-Complaint for Damages                                                              15

1 either continuous observation or the person be seen at least every 15 minutes. Suicide watch

2 precautions, when implemented, are universally recognized as being extraordinarily

3 effective in preventing suicides.

4       84.    An adequate suicide prevention program provides for the sharing of

5 information and observation amongst correctional, medical and mental health staff so that

6 potentially suicidal inmates are identified and treated appropriately.  An adequate suicide

7 prevention policy provides a mechanism by which relevant information can be received and

8 acted upon from the general public, family members, attorneys and outside medical

9 professionals.

10       85.    An adequate suicide prevention program includes suicide prevention training

11 to custodial and medical staff.  There is a positive correlation between suicide prevention

12 training and suicide prevention.

13       86.    An adequate suicide prevention program requires that when there is a suicide

14 or suicide attempt, that there is an adequate review of that event, so as to correct deficiencies

15 and to prevent similar future occurrences.

16 **CFMG-Placerville Jail September 2015**

17       87.    California Forensic Medical Group, Incorporated, commonly referred to

18 CFMG is a privately held California corporation, whose business is to outsource jail medical

19 services. CFMG crows that they are the largest such business in California with contracts

20 covering 64 separate facilities which house 15,000 inmates.

21       88.    In January of 2013, the doctors who started CFMG in 1983 sold a controlling

22 interest of the company to venture capitalists, H.I.G. (Harvard Investment Group) Capital,

23 LLC.   H.I.G. describes itself as a "leading global private equity investment firm with over

24 20 billion dollars of equity capital under management".  H.I.G., whose founders and co-

25 CEO's are Sami Mnaymneh and Tony Tamer, paid approximately 70 million dollars for

26 CFMG, whose only asset of value is the contracts it holds with local California governments

27 including El Dorado County.  CFMG was added to an international portfolio sharing a single

28 common denominator, the prospects of making large sums of money. H.I.G. has offices in

Spies-Complaint for Damages       16

eight (8) American cities, as well as six (6) in Europe and two (2) in South America. H.I.G.'s website for CFMG now boasts the motto "Always do the right thing". As is clear from this case and other cases, "Always do the right thing" is what CFMG/H.I.G. does for its investors albeit at the expense of the patients entrusted to their care. H.I.G. is using the CFMG profit model to set up similar lucrative medical out-sourcing ventures in the southwest, the southeast and the midwest.

89.     CFMG's investor friendly bottom line has been built on providing substandard care by cheaply hiring an inadequate number of medical personnel and part-time under or un- qualified medical personnel to properly service a captive patient pool. In no area has the downside of this business model been more obvious than in suicides and suicide prevention. In the ten year period ending in May 2014 jails contracting medical with CFMG saw a death rate from suicides and drug overdoses at a 50 percent higher rate than non-CFMG facilities.

90.     Not surprisingly CFMG's practices have led to to a swath of lawsuits across the state. Several class action suits including a recently settled Monterey County case (which was the birthplace of CFMG), where a federal judge found the medical and mental health care so troubling that he ordered a receiver's involvement similar to that in the state prison system's. Suicide litigation, with the recurrent themes of under staffing by unqualified part-time help have been brought in Yolo County, Mendocino County, Lake County, Ventura County, Fresno County, Santa Cruz County, Sonoma County and Imperial County.

91.     Since taking control of CFMG, H.I.G. has slashed physician and medical professional salaries while adding additional financial management staff to further maximize profits.

92.     The seeds for Jake Spies's death were sown in the July 2013-2018 contract between CFMG and El Dorado County. Through that agreement CFMG agreed to provide, in exchange for over three (3) million dollars annually, the medical and mental health services for the jail. CFMG also agreed to provide the designated medical director, program manager, mental health director, and suicide prevention plan, all of which are required by

Spies-Complaint for Damages                                                      17

1    Title 15.  (Though the Jail Policy/Practices Defendants' obligations in that regard are not

2    dischargeable.)

3          93.      The profitability for CFMG and the weakness of the care provided in this

4    case is evident from the staffing levels which are the core of the contract. The agreement

5    calls for, to be shared between three (3) separate El Dorado County facilities an aggregate

6    of: 16 hours a week for a single part-time physician, a total of four (4) hours a week of a

7    psychiatrist's time, and eight (8) hours a week of a psychologist's time. The agreement also

8    provides for, again between three separate facilities, one full-time and one part-time

9    registered nursing position. Almost all of the staffing is by part-time licensed vocational

10    nurses, LVNs, whose scope of practice does not permit them to lawfully initiate any medical

11    procedures, or to make any medical assessments. An LVN is allowed to distribute prescribed

12    medications and record data. LVNs are not permitted to work autonomously and are

13    supposed to be under the direct supervision and explicit direction of a registered nurse, at a

14    minimum.

15          94.      The greatest single weakness of medical care at the Placerville jail is the

16    dearth of any medical professionals, other than LVNs, between Friday afternoon and

17    Monday morning. This is the same time that brings in the greatest numbers of arrestees. For

18    someone who, like Jake Spies, is taken into custody on a Friday night, there will not be any

19    scheduled medical or mental professional available to perform or recommend a suicidal

20    assessment until Monday morning.  (A copy of the CFMG contract staffing schedule,

21    Exhibit E to the 2013-2018 El Dorado County Agreement, is Attachment 3 to the

22    complaint.) Further compounding the dangers this staffing level creates, there are no

23    available professionals to either recommend or to continue a placement on suicide watch in

24    a safety cell.

25          95.      Since their acquisition of CFMG by H.I.G., LLC and while the  2013-2018

26    contract with El Dorado County has been in effect there have been  three (3) El Dorado

27    County custodial suicides, all of which occurred on weekends when the jail is systemically

28    understaffed. All of these have occurred within 72 hours of booking and two (2) occurred

1   within 24 hours of entering the jail. This has resulted in a higher rate of suicides than even

2   that experienced by Sacramento County during the years 2002-2004.

3        96.     The CFMG Management/Entity Defendants (CFMG ,Dr. Raymond Herr,

4   Lisa Issacson, Dr. Taylor Fithian and Does 31-40,) are responsible for the medical and

5   mental health policies and practices, including staffing decisions, the suicide prevention

6   practices and policies and the supervision of medical staff at the Placerville Jail.

7   **September 19, 2015, and Suicide**

8        97.     Jake Spies arrived at the Placerville Jail from Marshall Hospital at about 1:20

9   a.m. on Saturday, September 19, 2015.  Plaintiffs are unaware at present which deputy or

10   deputies transported him to the jail, and what, if anything was said during that

11   transportation.

12        98.     As the first part of the jail medical screening process, Deputy Hangebrauck

13   submitted a booking "Health" form. A copy of that form is Attachment 4 to the complaint.

14   In a document dated September 18, 2018 (sic) at 10:48 p.m., Hangebrauck reported that "the

15   inmate's behavior suggest a danger to self or others" and further indicated that Spies'

16   "parents advise he is suicidal."

17        99.     At the time Jake Spies was booked into the jail, his risk factors for suicide

18   included: (i) historic facts that he had four prior suicide attempts with two of these attempts

19   in the preceding year; (ii) his a prior suicide attempt in custody; (iii) all of his suicide

20   attempts were serious attempts which could have easily led to his death; (iv) he had multiple

21   prior psychiatric hospitalizations, including several involuntary (5150) commitments; (v) he

22   was diagnosed with severe depression; and (vi) he had a history of alcohol and drug abuse.

23   Dynamic conditions that elevated Jake Spies' suicide risk included his dysphoric mood; his

24   irrational fear that El Dorado County was going to charge him with felony offenses for the

25   Coloma bridge-jumping suicide attempt and that he was intoxicated and had been drinking a

26   considerable amount that week. Environmental factors contributing to his risk of suicide

27   included that he was newly booked into jail and that it was a jail in which he had previously

28   attempted to commit suicide by hanging. His being a white male amplified all these risks.

Spies-Complaint for Damages                                             19

100.    Many of these risk factors were independently and readily verifiable at that time.  There was the jail's own records of the prior 2012 in-custody attempted suicide with a ligature, Deputy Hangebrauck was personally familiar with the 2014 Coloma bridge jump suicide attempt.  Spies had been treated extensively and recently by El Dorado County's Health and Human Services Mental Health division for his depression and suicidal tendencies.  Spies' parents could have additionally and easily  been contacted to confirm or provide additional details regarding the information given to Deputy Hangebrauck.

101.    At the time of Jake Spies' booking, the only person approaching a medical professional on duty was a CFMG LVN, Robin Hope. An LVN has both limited training and a limited scope of practice.  In this case, as set forth below, LVN Hope did not and legally could not provide custody staff with any guidance as to Jake Spies' suicidality and could not even  recommend that he be referred to a mental health professional.  This is, in hindsight not surprising given the limited scope of practice LVNs have. (Attachment 5ot this complaint is the State of California's California Correctional Health Care Services, Licensed Vocational Nurses Scope of Practice, that   spells out the scope of practice for LVNsin a correctional setting in accord with California CCR Title 16, Division 25. Section 2518.5, delineating a LVN's statutory practice limitations.)

102.    Hope recognized that Spies was still under the influence of alcohol at the time of his booking as she  entered data required to start a form tracking his alcohol withdrawal.

103.    Hope recorded Spies' answers to a jail medical screening questionnaire entitled, "Medical", a copy of which is Attachment 6 to the complaint. Spies gave affirmative answers to questions about whether Spies was currently suicidal or had felt or attempted suicide in the past year, as well as regarding his past mental health treatment. These responses alone required that a qualified mental health professional assess Spies for his acute risk of suicide.

104.    The questionnaire answers considered in conjunction with Spies' prior suicide attempt in the jail in 2012,  his history with El Dorado County's own mental health

Spies-Complaint for Damages                                                    20

1   program and the information relayed to Deputy Hangebrauck, made obvious and urgent the

2   necessity of  a competent suicide assessment and   immediate steps to safeguard Spies

3   pending a suicide risk assessment  obvious and urgent.

4        105.    Spies could have and should have been placed  in a safety cell and safety

5   garment, permitting frequent observation as well as depriving him of the means to harm

6   himself, pending the availability of a mental health professional to make a suicide

7   assessment of the sobered Spies.  This did not happen. Hope,  Hangebrauck and Does 1-5

8   and 11-20, all failed to take this simple action which would have saved Jake Spies' life.

9        106.    What did happen was that LVN Hope partially filled out a second CFMG

10  form entitled "Nursing Assessment of Psychiatric & Suicidal Inmate".  The name of  the

11  form is at the  least, misleading. It is neither a suicide risk assessment form nor a nursing

12  assessment.  The form a copy of which is Attachment 7 to the complaint indicates as does all

13  of Hope's paperwork that it was done at 1:22 a.m. on Saturday September 19, 2015.  This

14  form is not a suicide assessment instrument.  An LVN is not qualified to perform a suicide

15  risk assessment.  The records do not indicate how or if the information from Deputy

16  Hangebrauck,  the information available from the El Dorado County jail itself,  or any other

17  information was considered when completing the form.   Multiple individuals' handwriting

18  clearly appears on this form it is unknown when the entries were made or by whom.  The

19  form lacks the required co-signature of a registered nurse, nurse practitioner, or medical

20  doctor which is what would have been required, given the above referenced scope of

21  practice limitations  imposed on an LVN, to initiate the necessary suicide assessment or a

22  mental health referral.   The form indicates only one past suicide attempt, the in-custody

23  attempted hanging. This error suggests suggest that Hope had access to the prior records of

24  Spies at the jail. There is no explanation or attempt to explain the incongruent responses

25  between her Medical form (Attachment 6),   the Health form prepared by Deputy

26  Hangebrauck  (Attachment 4) or the records from his  examination Marshall Medical Center

27  prior to being taken to the jail. There is no attempt to harmonize or explain inconsistent

28  responses regarding depression attributed to Spies. There is no indication of any inquiry into

Spies-Complaint for Damages                                                    21

any past psychiatric hospitalization. There is no indication that Hope asked Spies about any of the information which had been relayed to Hangebrauck for the purpose of safeguarding Jake Spies. Furthermore, Hope does not answer the bottom line question, the only question in bold type face on the form, asking if the "Inmate is currently at risk to harm self or other(s)".  Hangebrauck's health form had answered this question "yes".  Hope left that blank. Then, in a further abdication of her duty to Jake Spies she checked the box indicating that the custody staff should simply place Jake Spies into whatever cell the classification officer decided. (However the mark in this box is one of the entries which appear to have been done at either a different time or by a different hand.) These responses, rather than communicating her inability to perform an assessment  and the necessity for an evaluation imply that, contrary to evidence and reason Jake Spies was had no heightened risk of suicidality.

107.    Although booked on DUI charges and still under the influence of alcohol, Jake Spies was not placed in a sobering cell as was mandatory by Title 15 and accepted correctional practice. At least in a sobering cell he would have been subject safety checks every half hour as well potentially of having a cellmate(s) who could have intervened if or when Spies manifested suicidal designs.

108.    Instead of placing Spies in either a safety or sobering cell Spies was placed alone in a general population cell, A-15. It was not outfitted with tear-resistant bedding to prevent ligatures being fashioned from it. Cell A15 is a double cell.  The double cells had an upper and lower bunk, with a fixed metal ladder to permit inmates to climb up to and down from the upper bunk.  As discussed above the actions of a cellmate are one of the two most common ways inmate suicide attempts are interrupted. Despite the cell's design for two people, Jake Spies was put in the cell by himself. However, because the design of that cell included a ladder to an upper bunk, there were ideal points of attachment for a ligature afforded by the rungs of the ladder.

109.    Although at least hourly cell safety checks are mandated by Title 15, the evidence presently available is that were no cell checks conducted from the time that Jake

Spies-Complaint for Damages                                                      22

1    Spies was placed in cell A-15 at approximately 1:30 in the morning until his non-responsive

2    body was discovered in the late afternoon on September 19th, 2015 at about 4:45 p.m. when

3    dinner was being delivered to Jake Spies' cell.

4         110.   The El Dorado County Sheriff's Department's report regarding Jake Spies'

5    death (the sheriff also oversees the coroner in El Dorado County), completed several days

6    after his death,   states that it was "unknown at the time of this report" when Jake Spies was

7    last seen alive by the correctional staff. Given that Title 15 and correctional practices

8    mandate that all safety cell checks be documented, the reasonable inference is that either no

9    cell checks were done or they were so inadequate that putting the time in the report would

10   further expose El Dorado County to civil liability.

11        111.   Paramedics pronounced Jake Spies dead at 5:02 p.m. on September 19th,

12   2015.

13        112.   The coroner's report did not indicate a time of death further suggesting that

14   Jake Spies had expired significantly before his body was discovered and that no mandatory

15   cell checks had been performed.

16        113.   The coroner's report and autopsy are clear,  however, as to the mechanism of

17   death which was the compression of Spies' neck thereby cutting off his air supply This was

18   done by fashioning a ligature out of torn bedding and attaching the ligature to a rung of the

19   ladder going up to the unoccupied top bunk.

20        114.   On information and belief neither the El Dorado County Jail

21   Policy/Procedure Defendants, the El Dorado County Jail Supervisory Defendants, nor the

22   CFMG Entity/Management Defendants, took any appropriate post-incident actions including

23   discipline, remedial education, changes in policy or practice. Both LVN Robin Hope and

24   Deputy Mark Hangerbrauck remain in their same positions.

25        115.   On information and belief, the inadequate medical and mental health staffing

26   at the Placerville Jail by CFMG, and in particular the over-reliance on LVNs and absence of

27   licensed professionals able to perform and refer inmates for suicide assessment and safety

28   cell placement, was a cause in fact of Jake Spies' death.  CFMG Entity/ Management

Spies-Complaint for Damages                                                    23

Defendants and the El Dorado County Jail Policy /Practices Defendants are responsible for this failure. The motivation for this failure is purely economic and based on a desire to maximize profits, rather than as a result of actual budgetary constraints.

116.    On information and belief, the Placerville jail is chronically understaffed, leading to a failure to do cell checks and a failure to properly classify inmates. This was a cause of Jake Spies' death. The understaffing is the fault of the EL Dorado County Jail Policy/Procedure and Supervisory Defendants. Since Spies' death, inmate deaths in 2016 have been tentatively associated with a failure to conduct mandatory safety checks.

117.    On information and belief, the suicide prevention program of CFMG Management Defendants and Placerville Jail Policy/Practice Defendants was defective and a cause of the death of Jake Spies. These failures include inadequate suicide risk screening, a systemic failure to communicate information necessary for proper suicide assessments, a failure to utilize safety cells and garments and a failure to adequately train staff.

118.    On information and belief, the contract between El Dorado County and CFMG has not been modified to address the staffing issues that resulted in Jake Spies death.

119.    On information and belief, the CFMG Defendants failed to adequately supervise LVN Hope which directly led to the death of Jake Spies. Further, it is an ongoing practice of CFMG to encourage LVNs to exceed their scope of practice for the purpose of increasing profits without regard to the effect of patient care.

120.    On information and belief, the El Dorado County Jail is systemically understaffed, which results in a failure to perform required cell checks. On information and belief, correctional supervisors do not ensure or require their subordinates make these checks.

121.    On information and belief, the El Dorado County's Placerville jail has a custom and practice of improperly classifying inmates and specifically, as with Jake Spies, of failing to adequately factor in intoxication and/or mental illness and/or risk of suicide in the classification process. On information and belief, the El Dorado County's Placerville jail has a custom of attempting to abdicate their duty to exercise independent judgment

regarding an inmate's risk of suicide by deferring to unqualified quasi-professionals, employed by CFMG.

122.    If or to the extent that Deputy Hangerbrauck and Does 1 through 5 failed to disclose to medical professionals and classification Jake Spies' suicide risks known to them then that was a cause in fact of Jake Spies' death and evidence of constitutionally deficient training and supervision.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

Deliberate Indifference to Serious Medical Needs, Health and Safety
(Violation of the Eighth Amendment to the U.S. Constitution:
Survival Action- 42 U.S.C. §1983)
(Against all named Defendants and Does, except Marshall Medical Center)

123.    On behalf of decedent Jake Spies, Plaintiffs re-allege and incorporate by reference paragraphs 1 through 122, as though fully set forth herein.

124.    Defendants knew or should have known that decedent Jake Spies was in danger of serious harm to his health and safety, including being at obvious risk of committing suicide, due to, amongst other factors, (1) his recent history of serious suicide attempts; (2) documentation in his jail records indicating a prior in-custody suicide attempt by a ligature; (3) his severe depression at the time of his arrest;  and (4) the information given to the arresting officer(s) regarding Spies' suicidal state.

125.    The medical and psychiatric symptoms that Defendants ignored were obvious and immediate threats to Jake Spies' health and safety.

126.    Despite knowing that Jake Spies was in danger of serious harm to his health and safety, Defendants failed to provide him with necessary evaluation and treatment andfailed to take action to provide him with necessary evaluation and treatment or to safeguard his person pending the availability of the necessary evaluation and treatment.

127.    Defendants' acts and/or omissions as alleged herein, including but not limited to the failure to provide Jake Spies with timely and adequate medical care, psychiatric care and/or to take other measures to protect him from serious harm including the failure to place

Spies-Complaint for Damages

him in a suicide preventive cell constituted deliberate indifference to Jake Spies' serious medical needs, health and safety.

128.   As a direct and proximate result of Defendants' conduct, decedent Jake Spies experienced the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life.

129.   The aforementioned acts and/or omissions of the individually named Defendants were malicious, reckless and/or accomplished with a conscious disregard of decedent's rights thereby entitling Plaintiffs to an award of exemplary and punitive damages according to proof to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## SECOND CAUSE OF ACTION
*Monell* Liability based on Customs, Practices or Policies
(Survival Action- 42 U.S.C. §1983)
(Against Defendants County of El Dorado, CFMG, Sheriff D'Agostini, Undersheriff Randy Peshon, Captain Max Foxworthy, Lt. Noren, Dr. Raymond Herr, Dr. Taylor Fithian, Lisa Issacson, and Does 6-10 and Does 31-40)

130.   On behalf of decedent Jake Spies, Plaintiffs re-allege and incorporate by reference paragraphs 1 through 129, as though fully set forth herein.

131.   The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Jake Spies' serious medical needs, health and safety and in violating decedent's civil rights were the direct and proximate result of customs, practices or policies, or the lack thereof, of the County of El Dorado, CFMG, Sheriff D'Agostini, Undersheriff Randy Peshon, Captain Max Foxworthy, Lt. Noren, Dr. Raymond Herr, Dr. Taylor Fithian,  Lisa Issacson, and Does 6-10 and Does 31-40.

132.   Such customs, practices, polices and/or procedures include, but are not limited to, an ongoing pattern of deliberate indifference to the serious medical needs and health and safety of El Dorado County Jail inmates, including the following: a failure to implement an appropriate suicide prevention program; a failure to provide for suicide assessments of at risk arrestees; a failure to provide appropriate staffing and training at El Dorado County Jail for providing inmates with adequate psychiatric treatment; a failure to

provide adequate mental health staffing, a failure to implement a policy to  that staff preforms timely and appropriate safety checks; a failure to create and/or implement guidelines to place  inmates on suicide precautions; a failure to establish policies ensuring the proper classification and housing of inmates and suicidal inmates in particular; a failure to adequately train and supervise employees and/or agents to prevent the occurrence of the constitutional violations alleged herein; and a failure to promulgate appropriate policies or procedures or take other measures to prevent the constitutional violations alleged herein.

133.   As a direct and proximate result of the aforementioned customs, practices, policies and/or procedures of said Defendants, or as a result of Defendants' failure to promulgate appropriate policies or procedures, decedent Jake Spies suffered the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life.

### THIRD CAUSE OF ACTION
Substantive Due Process- Loss of Parent/Child Relationship
(Violation of the Fourteenth Amendment
to the U.S. Constitution: 42 U.S.C. §1983)
(Against all Named Defendants and DOES, except Marshall Medical Center)

134.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 133, as though fully set forth herein.

135.   The acts and/or omissions as alleged herein in being deliberately indifferent to the serious medical needs of decedent Jake Spies by failing to summon or provide Jake Spies with medical care, psychiatric care and/or take other measures to prevent his death after noticing his suicidal impulses, perform safety checks, suicidal condition and/or need for medical attention, resulted in Jake Spies' suicide and/or death, which deprived Plaintiffs of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

136.   Such conduct by said Defendants "shocks the conscience."

137.    As a direct and proximate result of said Defendants' conduct, Plaintiffs suffered injuries and damages as alleged herein including pain and suffering and emotional distress.

138.    The aforementioned acts and/or omissions of the individually named Defendants were willful, wanton, malicious, reckless, and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**FOURTH CAUSE OF ACTION**
Wrongful Death: Professional Negligence/ Medical Malpractice
(Survival Action- Cal. Code Civ. Proc. § 377.60 et seq.)
(Against Defendants CFMG, Marshall Medical Center,LVN Robin Hope, Dr. John Skratt, Dr. Alexis Leiser and Does 26-50)

139.    On behalf of decedent Jake Spies, Plaintiffs re-allege and incorporate by reference paragraphs 1 through 138, as though fully set forth herein.

140.    Plaintiffs are the children of the decedent Jake Spies, who has no surviving spouse.

141.    The acts and/or omissions by as detailed herein directly and proximately caused the wrongful death of Jake Spies and were the direct and proximate cause of Plaintiffs' injuries entitling Plaintiffs to recover damages pursuant to Code of Civil Procedure section 377.60 et seq.

142.    The medical and/or psychiatric care rendered by CFMG, Marshall Medical Center,LVN Robin Hope, Dr. John Skratt  Dr. Alexis Leiser and Does 26-50, as described herein, was at a minimum negligent and did not comply with professional standards of care for such treatment, proximately causing Plaintiffs' injuries.

143.    The acts and/or omissions by the named medical providers as described herein directly and proximately caused decedent Jake Spies to suffer the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life.

**FIFTH CAUSE OF ACTION**

Spies-Complaint for Damages                                                                          28

**Failure to Supervise, Investigate and Discipline**
**(Survival Action- 42 U.S.C. §1983)**

(Against Defendants Sheriff D' Agostini, Captain Matt Foxworthy, Lt. Jackie Noren, Dr. Raymond Herr, Dr. Taylor Fithian, Lisa Isaacson, and Does 21-25 and Does 31-40)

144.    On behalf of decedent Jake Spies, Plaintiffs re-allege and incorporate by reference paragraphs 1 through 143, as though fully set forth herein.

145.    The constitutional violations by Defendants as alleged herein occurred as a result of the failure of Defendants Sheriff D' Agostini, Captain Matt Foxworthy, Lt. Jackie Noren, Dr. Raymond Herr, Dr. Taylor Fithian, Lisa Isaacson, and Does 21-25 and Does 31-40 to adequately supervise, investigate and discipline employee conduct.

146.    Sheriff D' Agostini, Captain Matt Foxworthy, Lt. Jackie Noren, Dr. Raymond Herr, Dr. Taylor Fithian, Lisa Isaacson, and Does 21-25 and Does 31-40 failed to adequately supervise, investigate and discipline subordinate employees in regard to preventing deliberate indifference to the serious medical needs, health and safety of inmates at the Placerville Jail. Said Defendants' failure to supervise, investigate and discipline employees amounted to deliberate indifference to inmates' right to be free of deliberate indifference to their serious medical needs, health and safety.

147.    As a direct and proximate result of the aforementioned failure to supervise, investigate and/or discipline, decedent Spies suffered the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for the following relief:

1.   For compensatory, general and special damages against each Defendant, jointly and severally, in the amount proven at trial;

2.   For punitive and exemplary damages against each individually named Defendant (excluding El Dorado County and Marshall Medical Center) in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

Spies-Complaint for Damages                                                    29

3.   For costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and as otherwise authorized by statute or law;

4.   For an order requiring that the Placerville jail have adequate medical and mental health staff available so that suicidal inmates can be properly screened and protected and that the El Dorado County Sheriff's Department implements adequate suicide prevention training.

5.   For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.


DATED:  September 19, 2016                    Respectfully submitted,



                                              /s/ Stewart Katz
                                              Stewart Katz,
                                              Attorney for Plaintiff



                              DEMAND FOR TRIAL BY JURY

        Plaintiffs demand trial by jury.


Dated:  September 19, 2016                    Respectfully submitted,



                                              /s/  Stewart Katz
                                              Stewart Katz,
                                              Attorney for Plaintiff

Spies-Complaint for Damages                                                          30