**LAW OFFICE OF STEWART KATZ**
STEWART KATZ, State Bar #127425
555 University Avenue, Suite 270
Sacramento, California 95825
Telephone: (916) 444-5678

**THE SCHAPS LAW OFFICE, A.P.C.**
Michael A. Schaps, State Bar #247423
732 3rd Street, Suite B
Davis, CA 95616
Telephone: (530) 238-5111

Attorney for Plaintiffs
LAWRENCE SPIES, SR., and LINDA SPIES, Individually
and as Successors in Interest of LAWRENCE SPIES, JR. (deceased)

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE SPIES, SR., and LINDA SPIES, Individually and as Successors in Interest of LAWRENCE SPIES, JR. (deceased),<br><br>Plaintiffs,<br><br>vs.<br><br>EL DORADO COUNTY, et al.<br><br>Defendants.<br>_____/ | NO. 2:16-cv-02232-WBS-GGH<br><br>**PLAINTIFFS' DISCLOSURE OF EXPERT WITNESSES** |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure and this Court's Pretrial Scheduling Order, Plaintiffs disclose the following persons who may offer expert testimony in a trial of this matter:

///

///

## A. RETAINED EXPERTS

**Donald Blair Maisel, M.D., F.A.C.E.P.**
4875 Venner Road
Martinez, CA  94553
(925) 963-6861

The report of Dr. Maisel is attached as Exhibit 1.  Dr. Maisel's deposition fee is attached as Attachment A to his report. As set forth in his report, Dr. Maisel will address Dr. Skratt's failure to meet the standard of care for an emergency room physician.

## B. NON-RETAINED EXPERTS

**Sergeant Marci Henscheid**
El Dorado County Sheriff's Office
c/o Angelo, Kilday & Kilduff, LLP
601 University Ave., Suite 150
Sacramento, CA 95825
(916) 564-6100

Sgt. Henscheid is a Correctional Sergeant with the El Dorado County Sheriff's Office with 25 years of correctional experience.

Sgt. Henscheid will testify generally to the factors which go into an inmate housing and classification decision. She will more specifically discuss what the factors were that went into the classification and housing decisions regarding decedent Jake Spies, as well as the role that Dr. Skratt's evaluation played in those decisions, including measures taken (and not taken) regarding Spies' risk of suicide in view of Dr. Skratt's evaluation.

**Lisa Isaacson, RN**
c/o Law Offices of Jerome M. Varanini
641 Fulton Avenue, Suite 200
Sacramento, CA 95825
(916) 993-4868

Lisa Isaacson is a Registered Nurse and at all relevant times was the Medical Manager at the El Dorado County Jail and held that position for approximately 9 years.

Lisa Isaacson will testify regarding the significance as to the levels of suicide prevention and assessment undertaken of an individual being deemed fit for incarceration following a request for a mental health assessment by a physician. She will further testify to what the effects of a "fit for incarceration" determination would be expected to have on CFMG staff doing medical intakes at the El Dorado County Jail. Ms. Isaacson will specifically address the significance of the fit for incarceration determination by Dr. Skratt in this case, including as it pertains to recommending suicide prevention precautions and further assessment by another medical/mental health professional.

**Taylor Fithian, MD**
c/o Bertling Law Group, Inc.
15 West Carrillo Street, Suite 104
Santa Barbara, CA 93101
(805) 879-7558

Dr. Fithian is a board-certified psychiatrist with over 30 years of experience providing medical and mental health services in a correctional environment, as well as developing, implementing and supervising suicide prevention programs, or aspects of those programs, in California jails. He has provided training and professional presentations regarding jail suicide risks, prevention and assessment.

Dr. Fithian will testify regarding the suicide risk factors associated with individuals in a jail setting. Dr. Fithian will also testify about the nature of suicide prevention steps in a jail environment generally and the El Dorado County Jail in Placerville specifically. He will also testify generally about the significance of the fit for incarceration determination by Dr. Skratt in this case.

Dated: August 9, 2018            LAW OFFICE OF STEWART KATZ

                                 By: /s/ Stewart Katz
                                     STEWART KATZ
                                     Attorney for Plaintiffs

# EXHIBIT 1

*Report Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)*

| | |
|---|---|
| Proceeding: | <u>Spies v. El Dorado County, et al</u>. |
| Case No.: | 2:16-cv-02232 WBS GGH |
| Incident Type: | Medical Examination of a Person in Custody/ Fit for Incarceration Exam |
| Incident Date: | September 18-19, 2015 |
| Location: | Marshall Medical Center Emergency Department |
| Expert: | Donald Blair Maisel, M.D., F.A.C.E.P.<br>4875 Venner Road<br>Martinez, CA 94553<br>925-963-6861<br>Email: donmaisel@gmail.com |

I have been retained by the Law Office of Stewart Katz as an expert witness in the above named civil action. I have been requested to render an evaluation of the care provided to decedent Lawrence Spies (hereinafter "Spies") by Dr. John Skratt in the Emergency Department at Marshall Medical Center on September 18, 2015. This report is based upon my independent review and consideration of the evidence listed herein.

**Expert Retention**

I have not given expert deposition or trial testimony in the past four years.

**Expert Witness Fees**

See Attachment A.

**Publications**

I have not had any articles or books published within the last ten years.

**Expert Qualifications**

I am a physician licensed by the State of California since 1980. I received my board certification in emergency medicine in 1989 and was recertified in 1999 and 2009. My FACEP was awarded in 1990. Between 1985-1995, I was certified as an Instructor for Advanced Trauma Life Support. I became certified in Pediatric Advanced Life Support (PALS) in 2006.

I graduated from the University of Michigan Medical School in 1979. I received my undergraduate degree with "Honors and Distinction" from the University of Michigan in 1975. I completed a residency program in Emergency Medicine at Mt. Carmel Mercy Hospital (Grace Hospital) in Detroit, Michigan and a General Hospital Rotating Program at Highland General Hospital in Oakland, California.

I have practiced emergency medicine in Northern California since 1987. I have 30 plus years of clinical experience in various types of emergency departments, including major teaching hospitals and trauma centers, private and community-based hospitals, and rural emergency medicine.

Within the last five years and for longer, a substantial portion of my practice has been in hospital emergency rooms. Specifically, I have worked at the emergency Departments at:

- John C. Freemont Hospital Mariposa, CA (2015-Present)
- Hazel Hawkins Memorial Hospital, Hollister, CA (2013-2015)
- San Ramon Regional Medical Center, CA (2011-2013)
- Sierra View District Hospital, Porterville, CA (2011-2012)
- Sutter Delta Medical Center, Antioch, CA (2006-2011)
- Santa Clara Valley Medical Center, San Jose, CA (1990-2006)
- John Muir Medical Center, Walnut Creek, CA (1991-1992)
- Letterman Army Medical Center San Francisco, CA (1988-1991)
- North Bay Medical Center Fairfield, CA (1987-1988)

While working in the Emergency Department in Santa Clara Valley Medical Center in San, Jose, CA, I also held the following positions:

- Co-Director, Emergency Department (2006)
- Associate Director (2005-2005)
- Site Coordinator, Stanford Emergency Medicine Residency Program (1992-2006)
- Co-Director, Emergency Medical Education (1992-2006)

During the course of my career, I have examined thousands of patients in order to determine whether they are fit for incarceration. I have also requested hundreds emergency psychiatric evaluations.

## Materials Reviewed / Evidence Evaluated

For purposes of my opinions expressed herein, I have reviewed the following

(a) El Dorado County Sheriff's Department Report # EG1508044, page numbers 4314-4325, Deposition Exhibit 1

(b) Health Questionnaire prepared by Deputy Hangebrauck, page 581, Deposition Exhibit 3

(c) Deposition transcript of John J. Skratt, M.D.

(d) Deposition transcript of Deputy Hangebrauck

(e) Jail Medical Screening form prepared by Robin Hope, page 008, Deposition Exhibit 10

(f) Jake Spies' toxicology report, page 4338, Deposition Exhibit 12

(g) Marshall Medical Center Protocol for the Care of Mental Health Patient in the Emergency Department, page 10257-10264, Deposition Exhibit 28

(h) All Marshall Medical Center records pertaining to this incident, including Jake Spies Patient Profile/ Demographic Information, pages 0001-0022, ER triage sheet by Edward Copeland, R.N., Patient Discharge Instructions signed Debora Beck, R.N., and the Emergency Department Records of Dr. Skratt. Deposition Exhibits 21, 22, 23, 24, 25, 26, and 37 were also reviewed.

## Incident Synopsis / Summary

Based upon my review of the above materials and my knowledge of the standard of care, my professional opinion is that Dr. John Skratt should have ordered a psychiatric evaluation of Spies when he examined Spies in the Marshall Medical Center Emergency Department on the night of September 18, 2015. His errors in judgment in deeming of Spies as "fit for incarceration" under the circumstances presented fell below the standard of care for emergency room physicians.

**Findings and Observations**

Dr. Skratt examined Spies for the purpose of determining whether or not Spies was fit to be incarcerated in the El Dorado County Jail. Although Dr. Skratt was initially concerned with Spies' alcohol intoxication, he quickly formed a belief that it was more likely that Spies presented with a psychiatric problem rather than alcohol intoxication. Dr. Skratt's handling of the psychiatric issue and failure to order a psychiatric evaluation fell below the standard of care for an emergency room physician.

In the case of Dr. Skratt's examination of Spies, instead of being belligerent or even near comatose as one frequently sees with acutely intoxicated patients, Spies presented as "reasonable… he is not apparently intoxicated…" (Skratt DT 54.) Because Dr. Skratt did not see any clear evidence of alcohol intoxication, he began to consider what else might be going on with Spies. (Skratt DT 55.)

Dr. Skratt noted various subjective concerns regarding Spies' mental state, including the following: (1) Spies presented with a very flat presentation, particularly for a person brought to the emergency room in connection with possible alcohol intoxication; (2) he admitted to being depressed all the time; (3) when Spies was arrested, he was under the influence and driving a car with an airsoft gun that looked like a functioning firearm which suggested the possibility that he intended to commit suicide by cop (Skratt DT 51, 67); (4) Spies had made a serious suicide attempt by jumping off a bridge (Skratt DT 51); (5) Spies was diagnosed with a mental health disorder or disorders (Skratt DT 61) and (6) Spies had been prescribed psychiatric medications. In addition, while Spies had explicitly denied being presently suicidal, Dr. Skratt knew that statement could not be relied upon both because of Spies' known history reflected above and because of his possible intoxication.

In his deposition, Dr. Skratt testified that since the patient clearly did not seem intoxicated, the focus of his evaluation quickly centered on the psychiatric component. (Skratt DT 55.) However, he either failed to obtain or did not attempt to obtain the information necessary to perform a competent psychiatric evaluation. Such information was immediately available from Spies himself, from Spies' parents and from Deputy Hangebrauck, who accompanied Spies to the hospital and spoke to Spies' parents.

Dr. Skratt failed to obtain the following additional information from the patient himself: (1) Spies' mental health diagnoses; (2) the psychotropic medications he was prescribed; (3) whether or not he was taking those medications; (4) the number of past suicide attempts; (5) any details of past suicide attempts, including the bridge incident (Skratt DT 120); and (6) his pattern of alcohol consumption and the extent of his alcohol consumption on the day in question.

Details about Spies' previous suicide attempts, including timing and potential lethality, were essential facts. That Dr. Skratt did not ask for any of these details indicates his psychiatric examination of Spies fell below the standard of care.

There was also additional information that should have been obtained from Deputy Hangebrauck, since Dr. Skratt spoke to him and recognized and listed him as one of the sources of Spies' patient history. (Skratt DT 122.) The information that should have been obtained from Deputy Hangebrauck includes the following: (1) that Spies' parents (who were at the scene of Spies' arrest earlier that evening) had informed Hangebrauck that Spies was currently suicidal; (2) that Spies had attempted suicide on at least three prior occasions; (3) that Spies had been involuntarily committed pursuant to Welfare and Institutions Code section 5150 on multiple occasions, including that past December when he attempted to run through an eighth floor hotel room window; (4) that there was a low speed car chase prior to Spies' finally stopping the car prior to his arrest; and (5) that Spies had previously attempted suicide at the El Dorado County Jail. When speaking with the deputy, there was no discussion regarding Spies' potential suicidality and no discussion regarding whether he should be on a psychiatric hold. (Skratt DT 121-124.)

Dr. Skratt acknowledged it would have been desirable to have contacted Spies' family for additional information but did not, even though he had their contact information in the emergency room records. Dr. Skratt testified he did not contact Mrs. Spies because he felt he had all the details he needed "to make a judgment for that patient in terms of active suicidality." (Skratt DT 133.) That Spies' parents reported that he was suicidal would have alone been sufficient for most emergency room physicians to order the patient detained for a psychiatric evaluation. In addition, Dr. Skratt acknowledged that had he been aware of the fact that Mrs. Spies had expressed to Deputy Hangebrauck, and explained the basis for her concerns, that her son was actively suicidal. That alone would have been enough for him, as it would for any reasonable emergency room physician, to order an emergency psychiatric evaluation. (Skratt DT 121-124, 133.)

Dr. Skratt testified that a significant factor in deciding not to get a separate psychiatric evaluation was that the deputy did not request one. (Skratt DT 79.) Relying on the evaluation of someone else, particularly a non-medical professional, when the patient is right in front of you is dangerous and unacceptable medical practice. If Dr. Skratt was relying on the deputy's opinion, then he should at least have had a discussion as to how the deputy came to that conclusion. Such a dialogue would almost certainly have revealed the parents' concerns about their son being acutely suicidal. Dr. Skratt admits that if he knew about the parents' concerns, **THAT** that "would carry weight." (Skratt DT 80.)

Even though the patient was brought into the ER for a clear for a "Clear for Custody" and possible alcohol intoxication, (Skratt DT 95), Dr. Skratt did not even bother to question Spies on his alcohol consumption. Instead he relied on the Nurses notes alone to determine the patient's alcohol use. Drug and alcohol screening are a very important component of the psychiatric evaluation, and Dr. Skratt showed poor professional judgement in not asking the patient straight up about his alcohol use. It is commonly known that alcohol and drug abusers either drastically under report their use, or deny them outright. Thus denying alcohol or drug abuse to the screening nurse can not be considered credible information. Dr. Skratt should have questioned the patient himself.

In fact, Spies' alcohol level was extremely high (.275 percent, which Dr. Skratt did not know), leaving no doubt he was a chronic alcoholic. A patient who is relatively calm and cooperative with a blood alcohol level greater than 3 times the limit, should have indicated to Dr. Skratt that Spies was indeed an chronic alcoholic. (A non-alcoholic patient with a blood level of 0.275% would be extremely intoxicated or even unconscious) This alone should have led to a much more serious and cautious approach to this patient, as it is well-known that there is a significant relationship between alcohol use and suicide. Specifically, If Dr. Skratt had properly recognized Spies as a chronic alcoholic with active depression who was found intoxicated in his car with an airsoft gun, then that should most assuredly have led to an emergency psychiatric evaluation.

Based on the facts available to Dr. Skratt, he should have requested an emergency psychiatric evaluation from a mental health professional. Despite the ample circumstances demonstrating that Spies needed a mental health evaluation, Dr. Skratt did not order an emergency psychiatric evaluation for Spies. A competent emergency psychiatric or mental health evaluation or a competent psychiatric evaluation would more probably than not have resulted in Spies not being deemed fit for incarceration or led to a recommendation of suicide precautions at the jail. Thus, in deeming Spies fit for incarceration under these circumstances, Dr. Skratt's omissions detailed herein fell below the standard of care for an emergency room physician and were a substantial factor leading to Jake Spies' death by suicide.

My professional opinions herein are expressed to a reasonable degree of medical certainty, although I reserve the right to amend, alter, enhance or delete findings and opinions in the event that I receive new and pertinent information pertaining to the events discussed. Otherwise, if called upon to do so, I would testify to the aforementioned findings and opinions under penalty of perjury.

Dated: August 7, 2018        By: /s/ Donald Maisel, MD
                                  DONALD MAISEL, MD

# ATTACHMENT A

# FEE SCHEDULE

## Don B. Maisel, M.D., FACEP

### MEDICAL CASE SCREENING FOR MERIT AND STRATEGIC PLANNING (This is a consulting service, separate from expert witness work)

| | |
|---|---|
| •Case screening and analysis, then presentation by phone (all medical specialty areas), brief written report included if requested. (additional hourly charges for reading depositions) | $2500 flat fee |
| •Affidavit | $2500 flat fee |
| •Preparation of Experts for Testimony | $500/hr |
| •Accompany Attorney to Opposing Expert's Deposition | $500/hr plus travel |

### MEDICAL EXPERT SERVICES

| | |
|---|---|
| •Initial Retainer Deposit (TBD, according to case) | $2500 minimum |
| •Retainer replenished for requested services if: remaining | < $500 |
| •Review of Medical Records | $500/hr |
| •Communication with Attorney (phone, fax or email) | $500/hr |
| •Written Reports | $500/hr |
| •Affidavit of Merit | $2500 flat fee |
| •Preparation for oral testimony (paid in advance) | $500/hr |
| •Literature Review (and report) | $500/hr |

•Testimony: estimated retainer and prior outstanding bills must be paid before reserving testimony dates and time.

| | |
|---|---|
| Deposition in-town (2 hour minimum, $1,500), thereafter, 1 pm cut-off for half day, morning or afternoon   $7500/full day | $3750/half day |
| Deposition out-of-town (includes travel time) | $7500/day |
| Trial or Hearing (includes travel time) | $7500/day |
| Meeting with Attorney: Face-to-Face | $750/hr |
| Videotaped Deposition (in lieu of trial) | |
| In-town (if less than half day), 1pm cut-off | $3750 |
| Out-of-town, or full day (before and after 1 pm) | $7500 |
| •All travel costs paid by attorney (air travel: business/first) | AQ |
| •Use of Private Auto | $0.54/mile |
| •Testimony Cancellation Charges (Full Retainer Charged) | < 7 days notice |

All third party deposits or payments, and rush service must be paid by cashiers check or money order. All rates are subject to change. Rush service available: $1000 surcharge